**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| International Watchman, Inc., | ) | **CASE NO. 1:13 CV 1986** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| The Nato Strap Co., *et al.*, | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendants. | ) | |

**INTRODUCTION**

This matter is before the Court upon Defendants' Motion for Summary Judgment of Trademark Invalidity for Genericness (Doc. 43).  This is a trademark infringement case.  For the reasons that follow, the motion is DENIED.

**FACTS**

Plaintiff, International Watchman, Inc., brings this lawsuit against defendants, The Nato Strap Company, Jason Taras, Suresh C. Sachdev, Expo International, Inc., Chris Hill, Clockwork Synergy, LLC, ADNweb, LLC, Worn & Wound, Crown and Buckle LLC, James Uminowicz,

1

the Watch Prince, FixFind, Inc., DaLuca, Inc., Strapped for Time, Inc., DeBeer Watch Bands, Inc., and Panatime Corporation.

In June of 2010, plaintiff filed a trademark application to register the mark "NATO" for "watches; watch bands and straps."  Later, in July of 2011, plaintiff filed a trademark application to register the mark "NATO G-10" for "watches; watch bands; watch straps."  No opposition was filed with respect to either application and both marks were placed on the Principal Register. Plaintiff subsequently filed this lawsuit asserting two claims for relief against each defendant.[1] Plaintiff first alleges that defendants engaged in both unfair competition and trademark infringement in violation of the Lanham Act.  Plaintiff also alleges that defendants engaged in unfair competition under state law.  The defendants filed a number of counterclaims against plaintiff.

Defendants move for summary judgment seeking to invalidate plaintiff's trademarks on the grounds of genericness.  Plaintiff opposes the motion.

**STANDARD OF REVIEW**

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed .R.Civ.P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion

---

[1]    Plaintiff filed three separate lawsuits, which this Court consolidated.

of fact or fails to properly address another party's assertion of fact as required by Rule 5(c), the court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remain unchanged" and the amendment "will not affect continuing development of the decisional law construing and applying" the standard.  See, Fed.R.Civ.P. 56, Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759

F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its

pleading, but must "produce evidence that results in a conflict of material fact to be solved by a

jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a

scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence

on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476,

479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is

"merely colorable" and not "significantly probative," the court may decide the legal issue and

grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

## **ANALYSIS**

Defendants argue that "NATO" and "NATO G-10" are generic terms for a certain

military style watch band.  According to defendants, these terms are commonly used in the watch

industry to describe a watchband comprising a "flexible (fabric or leather) strap that is one piece,

fits under the spring bars of the wristwatch, so that it will not fall, if one spring were to break,

and includes a plurality of rings for securing the loose end of the strap."  Defendants argue that

the watch industry, journalists, members of the public, and plaintiff itself all use the terms

"NATO" and "NATO G-10" to generically describe these types of watches and watch bands.

In response, plaintiff argues that its trademarks are entitled to a presumption of

nongenericness.  In addition, plaintiff points out that many of defendants' citations are to internet

postings, which plaintiff claims are inaccurate.  Plaintiff further supplies the Court with a survey

conducted with respect to this case.  According to plaintiff, the survey shows that, at a minimum, 89.22% of individuals surveyed believe "NATO" represents a brand name and is, therefore, not generic. With regard to "NATO G-10," the results show that at least 94.25% of individuals do not believe the phrase is generic.  As such, plaintiff claims a genuine issue of material fact exists as to whether the trademarks are invalid for genericness.

A "generic or common descriptive term is one which is commonly used as the name or description of a kind of goods.  It cannot become a trademark under any circumstance." *Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.*, 76 F.3d 743, 748 (6th Cir. 1996).  For federally registered marks, there is a "presumption that the term is non-generic and the defendant bears the burden of overcoming this presumption." *Id*.  Whether a name is generic is a question of fact for the jury.  *Id*.

"The primary significance of the registered mark to the relevant public...shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it is used.  *Nartron Corp. V. STMicroelectronics, Inc.*, 305 F.3d 397, 406 (6th Cir. 2002).  To determine whether a mark is generic, the Court must look to the "relevant public."  Ordinarily, "it is the term's meaning to consumers, not professionals in the trade, that is the test of genericness and descriptiveness for ordinary consumer goods."  *Id*. However, "relevant public," could be composed of a relatively small group of highly trained and knowledgeable professional customers for a particular specialized product or service."  *Id*. (holding that the relevant market for technology product was the participants in the semiconductor industry).  Evidence of the relevant public's understanding includes, "dictionary definitions, newspaper or other publications, generic use by competitors, generic use of the term

by the mark's owners, and use of the term by third parties in trademark registrations."  *Id.*

Upon review, the Court finds that defendants fail to present sufficient evidence to overcome the presumption of nongenericness.  Here, defendants point to internet publications from various sources demonstrating a generic use of the terms "NATO" and "NATO G-10.[2]"  By way of example,[3] defendants point to the following:

- An advertisement from Omega watchmaker indicating, "Another striking feature of the Speedmaster Professional Apollo 11 45th Anniversary Limited Edition watch is its brown coated nylon fabric strap which is inspired by the NATO straps that have equipped the timepieces issued to military personnel since the end of the 1950s;"

- An advertisement from Amazon for a "Seiko 5 Sports #SRP277 Men's Military Nato Black Grey Band 100M 24 Jewels Automatic Watch;"

- An advertisement from J.Crew indicating, "Give your watch new life with a new strap. Inspired by the nylon watch straps issued to British Defense Ministry agents
(called NATO straps by watch collectors), this version is compatible with our Timex® military watch, Timex vintage field army watch and Timex Andros watch;

- Blog from a London shopper from 1999 indicating, " Three others had mostly junk, although there were NATO straps at 5 pounds each;"

- A screenshot from a United Kingdom-based forum indicating, "I understand that all British forces are issued only the standard G10 NATO strap in gray (with 2 pieces/3 rings). The 1-piece/2-ring version that is frequently available for NATO-straps and others (e.g. for the Black Rhino) is frequently called "RAFstyle;"

- An internet post dated 1999 indicating, "If you can deal with nylon straps, the original NATO strap would/might look appropriate??? Just a thought;

---

[2]  The vast majority of the evidence presented involves use of "NATO" as opposed to "NATO G-10."

[3]  Defendants submit a number of documents consistent with those identified in this Opinion.

- Internet publications suggesting that "at least 63 prominent watch companies include 'Nato'-straps with their watches;" and

- A newspaper article recently appearing in the New York Times indicating as follows:

> The watch strap is a type many call a NATO. Whether it is in fact a NATO is a subject of considerable online debate, like most everything to do with the world of fine watches and [James] Bond.

> Named for the North Atlantic Treaty Organization, though likely created for the British armed forces, a NATO is classically a length of plain woven nylon with two stainless steel loops and a metal buckle. Like Bond or Galore, it is tough, resilient and hard to kill.

> And it is a certifiable trend. At least it was during the huge Baselworld watch fair held in Switzerland in the spring, when large numbers of watchmakers showed their costly wares on NATO straps, and before then on the wrists of Billyburg hipsters, still the most reliable early adopters when it comes to matters of style.

In addition to the aforementioned, defendants also point out that plaintiff itself used the term "NATO" generically.  For example, an order placed by one of plaintiff's reseller customers requests the purchase of "Nato style straps."  Plaintiff's invoice to another customer reflects the purchase of a "Nylon Nato," thus indicating that the phrase "NATO" refers to the product itself as opposed to the brand name.  As such, it is a generic use.

Defendants further point to an internet article produced by plaintiff in this litigation.  The article indicates as follows:

> Despite being known, the world over, as a "NATO," the ubiquitous nylon watch strap we all love and admire is in reality a product of the British Ministry of Defense (MoD) and its proper name is the G10 – named after the form used to requisite the strap. I too am guilty of calling the G10 a "NATO", probably because everyone else does! No excuse I know. So where exactly does this "NATO" business come from? We need to go back in time. The simple explanation is that like all equipment acquired for the military, the G10 was issued with a NATO Stock Number (NSN) and that is seemingly the most logical reason – an abbreviated term used in civilian horological circles for this type of band.

7

According to defendants, all of the aforementioned evidence demonstrates that manufacturers, sellers, customers, journalists, and plaintiff itself use the terms "NATO" and "NATO G-10" generically.  Defendants claim that this evidence is sufficient to overcome the presumption of nongenericness.

In response, plaintiff provides an affidavit from its president.  He avers that there are a number of references throughout the industry to the types of watch bands at issue in this case.  Some are generic, while others are nongeneric.  For example, the style watch band may be referred to as: Zulu®, RAF, Military Nylon, Black Ops®, Infantry® Grosgrain, or Scuba strap.  Plaintiff claims that its president worked with "different suppliers of ballistic nylon strapping material to design the product specifications to include stitched and welded seams, stamped buckles including logo and size, [and other features]."

Plaintiff's president further avers that he has reviewed various trade publications, published from 1998 through 2013, including "Wristwatches.  A Handbook and Price Guide," the "Complete Guide to Watches" and "StyleWatch Global Trade."  According to the affidavit, although these publications have sections entitled "Military Straps & Guards," there are no references to "NATO" or "NATO-style."  In fact, none of the publications contain any reference to "NATO" or "NATO-Style."

Plaintiff further provides a document entitled "Consumer Survey: Public Views Concerning the Primary Significance of NATO and NATO G-10."  According to the survey, the report was prepared for purposes of this litigation and addresses whether the consuming public believes "NATO" and "NATO G-10" to be generic terms for a military style watch.  The results of the survey show that anywhere from 89.22%-94% of people believe "NATO" to be a brand

name and 94.25%-97% of people believe "NATO G-10" to be a brand name.  In other words, plaintiff's evidence shows that only a very small percentage of respondents believe these to be generic terms.

In addition to presenting its own evidence, plaintiff disputes the evidence relied on by defendants.  For example, plaintiff claims that Rolex does not use the phrase "NATO" or "NATO G-10."  According to plaintiff, the web post presented by defendants is not an authentic Rolex watch.  Plaintiff claims that the band on the watch could in fact be one manufactured by plaintiff.  The same is true of defendant's references to Seiko.  Plaintiff claims that internet searches of both the Rolex and Seiko sites demonstrate no use of either phrase.  According to plaintiff, many of defendant's references are inaccurate and most of the watchmakers do not sell "NATO" bands.  As such, "NATO" and "NATO G-10" are not generic names.

In their reply brief, defendants provide the following evidence:

- An affidavit from an owner of one of the defendants in which he avers that he conducted a statistical sampling of internet searches and that the sampling reveals that the use of "NATO" and "NATO G-10" is universally generic;

- An affidavit from a British supplier of military watch bands to the Ministry of Defense since the early 1980s.  The affiant indicates that since this time period, the phrases "NATO" and "NATO G-10" have been used generically;

- An affidavit from a watch appraiser and dealer who avers that "There was never an issue with anyone using the name 'Nato' for this style of watch strap, because 'Nato' was an easy and universally understood expression that was used by both dealers and consumers. And, the expression, 'Nato style,' was also universally used since the very beginning of the use of the 'Nato' term;"

- An affidavit from a former owner of one of the defendants, in which the affiant avers that he first heard the term "NATO" in the early 1990s.  He further avers that "[t]he name of this type or style of watch strap -- as universally used by the Watch Industry for the product constituting watch straps of this style -- is 'Nato,' which as I have understood comes from the fact that the watch straps have a 'Nato Stock Number' written into the above British Ministry of Defence standards."

9

In addition to the aforementioned evidence, defendants provide the Court with a number of screenshots of watchmaker Omega's generic use of the word "NATO."  Defendants also point out that trademark applications for NATO were rejected in Europe.[4]"

Viewing the facts in the light most favorable to plaintiff, the Court finds that reasonable minds could differ as to whether the phrases "NATO" and "NATO G-10" are generic.  Here, defendants point to a number of internet postings from watchmakers, consumers, and journalists tending to demonstrate that some of the "relevant public" uses the term generically.  On the other hand, plaintiff points out that searches of many watchmakers' websites show that they do not use the phrase "NATO" or "NATO G-10."  In addition, plaintiff provides the Court with a statistical analysis demonstrating that the general purchasing public does not believe the words "NATO" or "NATO G-10" are generic names for military style watchbands.  Rather, the overwhelming number of respondents indicated that their belief is that they are "brand names."  And, although defendants claim that the survey fails to include the proper population, uses misleading questions, is not objective, and was not conducted by qualified personnel, defendants do not move to strike the survey.  Moreover, these challenges arose in defendants' reply brief and, therefore, plaintiff did not have an opportunity to respond.[5]

To the extent defendants claim that the general public is not part of the "relevant public," the argument is rejected.  As set forth in *Nartron*, in the "appropriate case," the "relevant public"

---

[4]     Defendants also make a "first use" argument.  This argument, however, was not raised in defendants' motion.  As such, it will not be considered.

[5]     In large part, these issues likely arose because defendants filed their motion well before the dispositive motion deadline and also before the deadline for expert discovery.

10

includes "manufacturers, customers, suppliers, vendors, and the trade and technical press."

*Nartron*, however, involved a highly specialized product that does not appear to be widely

purchased by the general public.  Unlike the product in *Nartron*, there is no indication that only

specialized purchasers buy military style nylon watch straps.  To be clear, the Court is not

*limiting* the "relevant public" to the "general public."  Rather, the Court simply notes that the

knowledge of the general public-- as consumers of watch bands-- is relevant to determining

genericness in this case.  As such, plaintiff's survey is one piece of evidence to consider.

Whether a name is generic is a question of fact for the jury.  Here, defendants' evidence

is insufficient to establish genericness as a matter of law.  Plaintiff's evidence, together with the

presumption that exists in favor of nongenericness is sufficient to create an issue of fact.  *See*

*also, General Conference of Corporation of Seventh-Day Adventists v. McGill*, 617 F.3d 402

(6th Cir. 2010)(rejecting defendants' evidence and holding as a matter of law that phrase

"Seventh-day Adventist" is nongeneric).

### **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment of Trademark

Invalidity for Genericness (Doc. 43) is DENIED.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 10/16/14

11